RAINEY ET AL., APPELLEES, *v.* THE CINCINNATI STREET RY. CO., APPELLANT.

(Nos. 7625 and 7626—Decided December 8, 1952.)

*Messrs. Marble & Vordenberg* and *Mr. Edward A. Burke,* for appellees.

*Mr. Leo J. Brumleve, Jr.,* for appellant.

*Per Curiam.* On January 8, 1951, at about 6:30 o'clock in the morning plaintiff Pauline Rainey alighted from a trackless trolley bus of the defendant on which she had been a passenger and immediately fell to the street, receiving physical injuries. She instituted cause No. 7625 for damages on account of her physical injuries, and her husband instituted cause No. 7626 to recover for loss of services, consortium and expenses. The trial resulted in a verdict of $20,000 for Pauline Rainey and a verdict of $5,000 for her husband. During the trial, the defendant moved for instructed verdicts at the close of the plaintiffs' evidence and at the conclusion of all the evidence, all which motions were overruled. After the verdicts were returned and before judgments were entered, the defendant moved for judgments notwithstanding the verdicts, which the court overruled. After the judgments were entered, the defendant moved for a new trial, which was granted on the sole ground that the amounts awarded were manifestly against the weight of the evidence.

The defendant appealed from the orders overruling its motions for instructed verdicts made at the close of all the evidence and for judgments notwithstanding the verdicts, and the plaintiffs perfected cross-appeals from the orders granting new trials on the ground that the court abused its discretion in so doing.

The plaintiff Pauline Rainey alleged in her amended petition that the defendant violated its duty as a common carrier of passengers in that it failed to observe the provision of an ordinance of the city of Cincinnati, wherein the incident occurred, requiring it to stop for

receiving or discharging passengers with the wheels of the bus not more than 12 inches from the curb; but instead, that defendant stopped its bus about five feet from the curb, thereby requiring plaintiff to alight at a place rendered unsafe because of the defective condition of the street. On this subject she alleged that the street had been paved with granite blocks in the first place and that later these blocks had been covered with black asphalt ''several inches thick.''

Pauline Rainey had been using this same bus as a means of transportation to her place of employment every working day for about four months, alighting at the same stop.

The circumstances surrounding the receipt of her injuries are best described in the testimony of the plaintiff herself. After stating her name, age, the condition of her health, and that she had been employed as a machine operator at the same place prior to January 8, 1951, she proceeded as follows:

''Q. Now, Mrs. Rainey, what time did you report for work? A. At seven o'clock.

''Q. And how did you travel to your place of employment? A. On a trolley bus.

''* * *

''Q. Calling your attention to the morning of January the 8th, 1951, what car did you board that morning? A. A Colerain-Chester Park.

''Q. And where did you alight? A. At the bus stop at Colerain and Straight street.

''Q. Did you give a signal to the operator to let you off there? A. Yes, I did. I rang the bell and went to the door.

''* * *

''Q. Now, at what time of the morning was this? A. Six-thirty, a. m.

''Q. And what was the situation at that time with

reference to light or darkness? A. It was very dark.

"* * *

"Q. What could you see at that time? A. I couldn't see anything.

"* * *

"Q. Where did it stop? A. It was about four or five feet from the curb, and I was in the street.

"* * *

"Q. And from what door of the bus did you alight? A. The front door.

"Q. Now will you state where the bus stopped, that is, the portion of the bus where the front door was with relation to Straight street? A. It was around 25 feet from the corner, around that; I'm not sure. And when I stepped down off the bus I went right down on the street and I sit out in a sitting position, and pain shoot up in my back and I couldn't move, and the bus driver got off and a fellow and picked me up.

"* * *

"Q. The bus stopped between those two driveways? A. Yes.

"* * *

"Q. Was there a designated stop or sign there? A. Yes, there's a sign there on the pole. There's a sign— They changed the stop since I fell and the stop is further down to the corner now.

"Q. Now, Mrs. Rainey, what is the condition of the street at the point where you alighted? A. Well, there's an awfully bad place in the street. It's around, I'd say—.

"* * *

"A. Well, there's a dished out hole in the street. It's sort of like this (indicating), and I would say it's around 35 feet long, and I'd say it was around three or four feet wide, and it's dished out like. And I went right down in this hole when I slipped off the bus

in a sitting position, and my feet were sticking straight out in front of me, and my feet did not hit the curb.

"Q. Now, calling your attention to the weather what was the condition that day? A. Well, it had snowed the day before and there was a lot of snow and it was very icy.

"Q. But was there any difference in the snow generally and that which was in the portion which was used for traffic on the street? A. No.

"Q. Now, you mentioned that there was this dished out place for about—I think you said 35 feet long. Where does that commence and where does it extend? A. Well, it starts from the corner of the street. It's around, I'd say 25 feet; I'm not sure but something like that. And it was about thirty feet from the corner where I fell, and I went right down in this hole.

"Q. Now, let's see. You say it starts about 25 feet from Straight street. A. Well, from the corner building on Straight street.

"Q. In which direction does it extend there? A. Well, I don't know. It goes back.
"* * *

"Q. Now, Mrs. Rainey, was [sic] was the condition and the depth of the snow in the street where you fell? A. Well, the snow was packed down, and there was nothing to stop the bus from going to a point up to the curb at all because the snow was all packed down smooth. It was icy.

"Q. It was what? A. It was pretty icy. It was all packed down.
"* * *

"Q. Was there any particular amount of snow at the curb? A. No. It was all packed down even. It was all smooth.

"Q. And had there been any snow plows past there? A. No. There was nothing piled up there at all. Nothing piled up at the curb at all.

"Q. Now, you described this rut or depression in the street. What was the approximate depth of it? A. Oh, I'd say around six inches. I'm not sure.
" * * *

"Q. Can you say approximately how much shorter the step would have been if the bus had stopped at the curb and you could have stepped to the curb instead of into this depression? A. Oh, I'd say maybe three or four inches."

On cross-examination, she testified:

"Q. Now, when you alighted from the bus there was ice and snow in the street, wasn't there? A. It had snowed the day before and the ice was packed down.
" * * *

"Q. I mean, you couldn't see the street itself. It was covered with snow and ice. Isn't that right? A. All I know is I stepped off the bus, I went down and I had pains that shoot up in my back and that's all I remember.

"Q. Now, would you please answer my question. The street there was covered with snow and ice, wasn't it? A. Yes, there was ice there.
" * * *

"Q. Now, when you stepped from the bus did you fall as soon as your foot came down into the street? A. That's right. I stepped right down and went right on down.

"Q. All right. Now as soon as your foot came down on the street you fell. It was right by the door? A. That's right.

"Q. And did you slip or did your ankle turn or what caused you to fall? A. I stepped down and I went right down. That's all I know.

"Q. But what caused you to fall? Did you slip on the snow and ice or did your ankle turn or did you trip over something as you stepped off the step or what? A. No. All I know is I just fell when I stepped down.

"Q. You can't tell us whether you slipped on the snow and ice or whether your ankle turned? You can't tell us that? A. No, my ankle didn't turn. I know that.

"Q. Your ankle didn't turn. We have eliminated that now. You didn't trip over anything on the step of the bus, did you? A. No.

"Q. And your ankle didn't turn. Now, can you tell us whether you slipped on the ice or snow which caused you to fall? A. That I don't know. I stepped down and I went right on down in a sitting position.
"* * *

"Q. You know, of course, when you left home that day that the roads were icy and slippery? A. Yes.
"* * *

"Q. And you had stepped from the bus at that location many, many times before, hadn't you? A. Not at that—I don't think at that same spot, no.
"* * *

"Q. Now, you said that that depression in the street was six inches deep; is that right? A. No. I mean up to the curb the way that it goes down it's about that. I'm not sure.

"Q. But you did say that it was six inches deep. Wasn't that your answer?
"* * *

"Q. I want you to point out now where on that street you think that it was six inches deep. A. From the hole here (indicating) I think—I'm not sure whether it's that deep or not—up to the curb here is what I'm trying to say.
"* * *

"Q. Oh, there's spaces were [sic] the joints are, but I mean there's no granite block missing? A. No, none missing.
"* * *

"Q. Now, this bus has vertical rods, several vertical rods just at the location of the steps where you step off the bus; isn't that right? A. Yes.

"Q. Were you holding onto those rods? A. Oh, yes.

"Q. And did you hold onto those rods until you were safely on the street? A. I don't remember that. All I know is I stepped down and I went right down.
"* * *

"Q. Now, this place here, this whole street here (indicating) was covered with snow, wasn't it? A. Yes.

"Q. And you couldn't see the granite blocks any more than you could see the blacktop part of the street; isn't that right? A. I don't remember seeing any.
"* * *

"Q. You notice that there is a boulevard light pole there, isn't there? A. Yes.
"* * *

"Q. How close was that to the point where you say the accident happened?
"* * *

"A. Oh, I'd say between 25 and 30 feet.
"* * *

"Q. And where were you with reference to the step?
"* * *

"A. I was down in this dug-out place. It was slanting.
"* * *

"A. They [sic] was lights burning inside the bus, yes.
"* * *

"Q. Between where the bus stopped and where you got off, between that and the city light there was nothing whatever, was there? A. No, sir, I don't think so.
"* * *

"Q. And there was snow on the sidewalk, wasn't there? A. Yes.

"Q. And there was snow up in the gutter of the street, wasn't there. A. No. It was packed down. The snow was all packed down.

"Q. Well, do you know what packed it down? A. Well, it was frozen; it was in ice."

On redirect examination she said that the blacktop which had been worn from the granite blocks had accumulated in the gutter along the curb and extended out from the curb about seven inches. She did not testify as to the thickness of this accumulation.

This trolley bus was proceeding northwardly on Colerain avenue when it arrived at the regular stop at Straight street. Photographs were introduced of the street at that point. These photographs show that while there is a curb at that point, it cannot be more than two or three inches in height; and that it is not continuous, being broken in two places to accommodate two driveways into the contiguous premises. These photographs show also that the surface of the street was comparatively level, that the wearing of the asphalt had been gradual, and that there was no abrupt offset where the granite became exposed.

The photographs show also that had the bus stopped within 12 inches of the curb, exactly opposite the stop sign or near that point, Pauline Rainey would have been exposed to as great or greater hazards of the same character, resulting from conditions existing because of the permanent condition of the street accentuated by the weather conditions. Indeed, it would seem that had the bus stopped within 12 inches of the curb opposite the stop sign, she would have been discharged directly over the grilled covering of an intake to a storm sewer.

As disclosed by the undisputed testimony, this acci-

dent occurred on a winter morning before dawn, when the streets and sidewalks were covered with ice and snow, and these conditions were known equally by Pauline Rainey and the employees of the defendant.

There is no evidence that the plaintiff Pauline Rainey had been accustomed to stepping from the bus onto the curb or sidewalk. Nor is there any evidence that she was misled in any way by the stopping of the bus four or five feet from the curb rather than within 12 inches thereof. It is a fair inference from her testimony that at no time has the plaintiff contended that her injuries were received at a place other than the regular stopping place where she had been accustomed to alight.

The plaintiffs alleged that the ''greater distance'' she was required to step and the slippery and uneven surface caused her to slip and fall. However, the testimony of Pauline Rainey fails to sustain these allegations. She does not testify that she slipped. She does not testify that she could not reach the surface of the street by taking the usual step from the bus. The photographs, as well as her testimony, show that any unevenness in the surface of the street at that point was very slight—so slight that it could not be said that the municipality had failed to discharge its duty under Section 3714, General Code, to keep its streets open, in repair, and free from nuisance. Pauline Rainey did not testify that she was caused to fall by reason of any unevenness or other condition of the street.

A litigant who becomes a witness is bound by his testimony and where he is the sole witness to the facts his failure to testify on an essential issue is equally fatal. He is bound by his admissions on the witness stand. *Winkler* v. *City of Columbus,* 149 Ohio St., 39, 77 N. E. (2d), 461.

It is urged that the failure to stop within 12 inches

of the curb was a violation of the ordinance and that that constituted negligence. We fail to see where that had anything to do with the plaintiff's injuries or that it constituted a violation of any duty owing to her by the defendant.

It is true that as a part of its duty to exercise the highest degree of care for the safety of its passengers compatible with the practical operation of a trolley bus, the defendant was required to provide a reasonably safe place to alight. *Mahoning & Shenango Ry. & Light Co.* v. *Leedy,* 104 Ohio St., 487, 136 N. E., 198. That duty, however, does not extend to relieving a passenger from hazards to which he in common with the public was subject. Both Pauline Rainey and the employees of defendant ventured out upon that wintry morning with knowledge that ice and snow covered the streets and sidewalks of the city. They knew that snow and ice covered the entire area (street, sidewalk, and curb) which by any definition could be regarded as the place at which Pauline Rainey had been accustomed to alight, and at which she signaled the operator to stop on the morning in question. While the record shows clearly that Pauline Rainey fell, it leaves the cause of her falling to conjecture. Certainly, there is no evidence that it was caused by defendant's fault or negligence. It is not enough to just point to a coincidental negligent or unlawful act on defendant's part. Such act is unimportant unless it is a direct cause of the injury, that is, that the injury was the natural and probable consequence of such negligent act. 6 Ohio Jurisprudence, 943, Section 310. Had Pauline Rainey been injured by some hazard peculiar to the vehicular part of the street, such as a passing automobile, a different question would have been presented.

*Morrison* v. *Rhode Island Co.,* 87 A., 199, 45 L. R. A.

(N. S.), 988, has many features common to the case at bar. A street surface sloped from two to three inches from a point about nine inches from the car rail to the mouth of a sewer, thus increasing the distance from the running board to the street surface. The plaintiff, who was a fleshy and heavy person, claimed that this additional distance prevented her from holding onto the stanchions until her foot reached the street. The trial court directed a verdict for the defendant which the Supreme Court affirmed, saying at page 990 of 45 L. R. A. (N. S.):

"The first thing to be considered is the question of the defendant's negligence. Was the danger of alighting at the point in question so obvious that the defendant was guilty of negligence in stopping its car there? The defendant had made it a stopping place for some years and the plaintiff had many times alighted from the cars there. So far as appears, neither the plaintiff nor anyone else had ever before experienced any difficulty there. The sewer pocket and the sloping surface around the mouth thereof were in good repair and were otherwise just as the municipal authorities intended they should be. Their appearance was not suggestive of danger. The testimony does not disclose, nor is it claimed, that there has ever been any occurrence at or complaint made concerning this locality which might apprise the defendant that it was a place of danger.

"We do not think that the defendant was guilty of negligence in stopping its car where it did."

It is manifest from the plaintiff's testimony that there was no substantial depression in the street at the point where she alighted. By comparison with any adjacent portion of the street, it could not possibly have been more than two or three inches at its deepest point, and there is no evidence that she alighted at that point.

388

We are of the opinion that the trial court erred in overruling the defendant's motions for instructed verdicts and for judgments notwithstanding the verdicts. This conclusion makes it unnecessary to consider the plaintiffs' cross-appeals.

For these reasons, the judgments are reversed, and final judgments are rendered for the defendant.

*Judgments reversed.*

HILDEBRANT, P. J., MATTHEWS and ROSS, JJ., concur.